UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------------x
                                :

MALVIA GONZALEZ, ON BEHALF OF T.H.    :         3:13 CV 979 (JGM)
                                :
V.                                    :
                                :
CAROLYN W. COLVIN                      :
ACTING COMMISSIONER OF             :
SOCIAL SECURITY                    :         DATE: JULY 7, 2014
                                :
-------------------------------------------------------- x

RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR ORDER REVERSING THE
DECISION OF THE COMMISSIONER, OR TO REMAND TO THE COMMISSIONER,
AND ON DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

        This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and

1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social

Security ["SSA"] denying plaintiff's minor son Supplemental Security Income ["SSI"] .

## I.  ADMINISTRATIVE PROCEEDINGS

        On April 29, 2010, plaintiff, on behalf of her minor son, T.H., applied for SSI benefits

due to T.H.'s attention deficient/hyperactivity disorder ["ADHD"], dysthymic disorder, and

generalized anxiety disorder. (See Certified Transcript of Administrative Proceedings, dated

September 9, 2013 ["Tr."] 99-105; see also Tr. 38, 47, 60, 94).  Plaintiff's application was

denied initially and upon reconsideration.  (Tr. 48-57; see Tr. 28-47).  On January 13, 2011,

plaintiff filed a request for a hearing before an Administrative Law Judge ["ALJ"] (Tr. 60;

see Tr. 61-64), and a hearing was held on February 1, 2012 before ALJ Ryan Alger, at which

T.H. and plaintiff testified. (Tr. 454-73; see Tr. 76-93).  Plaintiff was, and continues to be,

represented by counsel.  (Tr. 58-59; see Tr. 65).  On May 1, 2012, ALJ Alger issued his

decision denying plaintiff benefits (Tr. 11-27), and on June 28, 2012, plaintiff filed her

request for review of that decision.  (Tr. 10).  On May 31, 2013, the Appeals Council denied

plaintiff's request for review (Tr. 5-8), thereby rendering the ALJ's decision the final decision of the Commissioner.

On July 11, 2013, plaintiff commenced this action on T.H.'s behalf.  (Dkt. #1).[1]  On September 16, 2013, defendant filed her answer. (Dkt. #10).[2]  Thereafter, on November 18, 2013, plaintiff filed her Motion for Order Reversing the Decision of the Commissioner, or in the alternative, Motion for Remand for a Rehearing, with brief in support (Dkt. #13), and on March 11, 2014, defendant filed a Motion to Affirm the Decision of the Commissioner, with brief in support.  (Dkt. #18;  see also Dkts. ##14-17).

For the reasons stated below, plaintiff's Motion to Reverse the Decision of the Commissioner, or to Remand to the Commissioner (Dkt. #13) is granted in large part, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #18) is denied in large part and granted in limited part.

## II. FACTUAL BACKGROUND

### A. HEARING TESTIMONY

T.H. was born in 2003 and is currently ten years old.  (Tr. 99).  At the time of the hearing in February 2012, T.H., who was then eight years old and in second grade, testified that he likes gym, art, music and recess and that he has a best friend.  (Tr. 461-63).  He likes to play video games, "like violent ones[,]" and likes to play his XBox and his computer with his mother.  (Tr. 463).

When asked where he lives, T.H. responded, "[w]e're actually bunking on Ms.

---

[1]On the same day, plaintiff also filed a Motion for Leave to Proceed In Forma Pauperis, which motion was granted four days later.  (Dkts. ##2, 6).

[2]Attached to the answer is a copy of the Certified Administrative Transcript, dated September 9, 2013.

Herbert's sofa . . . actually until we get a house." (Id.).  In addition to "Ms. Herbert" and his mother,[3] T.H. also lives with three other children, ages ten, eight and six, with whom he fights with "[a] lot."  (Tr. 463-65).  In T.H.'s words, he "don't listen that much" to his mother; consequently, his mother gets upset with him often.  (Tr. 464).  Plaintiff testified that T.H. does not get along with the other children because he is used to being alone with his mother.  (Tr. 466; see also Tr. 472 (confirming that T.H. is "an only child[.]")).[4]

Regarding school, plaintiff testified that T.H. has a problem "with hands [–] keeping them to himself."  (Id.).  T.H. will continue to touch, tap or poke someone even after being asked to stop.  (Tr. 470).  At the beginning of the 2011-2012 school year, there was an issue of T.H. playing on the stairs, apparently trying to push another child down the stairs.  (Id.). Additionally, he throws tantrums if he does not get his way, and he gets "very frustrated when he can't get something and nobody pays any attention" to him.  (Tr. 466).  According to plaintiff, this behavior occurs about once a week, although it used to happen "a lot more" before T.H. started taking Strattera.  (Tr. 466, 468).  The medication is helpful "in some ways[,]" but plaintiff is "still going through the motions of finding one that doesn't make him drowsy" yet keeps him focused.  (Tr. 466-67).   According to plaintiff, even when T.H. is focused, he is "not too great" with reading comprehension, although he is "okay" in spelling and math.  (Tr. 467).  When he first starts medication, he can focus and get his work done for at least half of the day but then the medication wears off.  (Tr. 471).  Plaintiff testified that T.H. is seen by Dr. Richard Sadler and twice a month by a counselor at Behavioral Health in Middletown, Connecticut.  (Tr. 467).  Plaintiff has told Dr. Sadler that the

---

[3]T.H. does not know his father.  (Tr. 172).

[4]But see Tr. 338, 340, 381, 383 (referring to T.H.'s "older sister").

medication has to be increased because while his focus may be better, he is not "staying still[]" if the teacher does not keep him occupied; he starts "fidgeting, moving about, touching the other kids." (Tr. 471).  T.H. attends social skills classes, extra reading classes, and a language class for his stuttered speech.  (Tr. 467).  Additionally, "a parent" works "one[-]on[-]one [with T.H.] to help him stay focused and redirect him[.]" (Tr. 471).

In addition to taking Strattera, T.H. takes Zoloft for depression, and he takes 50 mg of Ritalin/Metylin in the afternoon, and .5 mg of Clonidine/Catapres at night to sleep.  (Tr. 257, 355, 359-60, 395-96, 468).  He also takes Concerta/Methylphenidate/Metadate (Tr. 257, 354, 359; see also Tr. 243, 255, 355, 409-12) and ibuprofen (Tr. 427). Without the Clonidine, T.H. would be awake until two or three o'clock in the morning.  (Tr. 469). A side effect of the Zoloft that plaintiff notices in T.H. is a tendency to be more aggressive, and the medication "takes away" his ability to figure out what is safe and what is not.  (Id.).

When T.H. is upset, he breaks pencils or bends or breaks toys, or stomps around the house, hitting his hand on the wall.  (Tr. 470).  At home, T.H. cannot sit still, he has "very little[]" impulse control, "[l]ike if decides that he wants to think he's Superman and decides he's going to try jumping off something high in the house[,] he'll do it."  (Tr. 469-70). Plaintiff does not close doors because she wants to be able to see T.H. at all times.  (Tr. 470).  According to plaintiff, it generally takes four or five times for T.H. to do something that he is asked.  (Id.).

At the time of the hearing, plaintiff was unemployed but involved in an internship for substance abuse counseling at Connecticut Valley Hospital.  (Tr. 467).  Through the YMCA, she secured mentoring services for T.H.; he sees a mentor twice a week for an hour and a half to two and a half hours each session.  (Tr. 471-72).   T.H. "enjoys that because that's

4

the only male bonding he has." (Tr. 472).[5]

B. MEDICAL RECORDS

On March 31, 2010, Dr. Richard Sadler of Middlesex Hospital completed a Psychiatric Evaluation Report of T.H.; T.H. was then six years old. (Tr. 338-43, 381-86). Dr. Sadler found that T.H. appeared "somewhat slow in development[.]" (Tr. 338, 381). He found T.H.'s use of vocabulary to be appropriate, and that he speaks in "a generally easily understandable tone of voice." (Tr. 339, 382). According to Dr. Sadler, T.H. is "impulsive and mildly hyperactive[,]" but he "show[ed] sufficient impulse control[,]" and his "activity level, while nearly constant, [was] not intrusive or aggressive." (Id.). T.H. followed directions from his mother, although he "becomes distracted or his impulse control leads him to get into another situation requiring his mother's new correction." (Id.). Dr. Sadler noticed "no unusual gestures or mannerisms throughout [the] interview[,]" and he observed that T.H. is "sensitive emotionally," and is "always in an appropriate direction regarding the circumstances at hand." (Tr. 340, 383).

Dr. Sadler noted that "[w]hile there are numerous suggestions of symptoms that might be considered of more atypical behaviors or even a pervasive developmental disorder[,] in fact, sitting clinically with [T.H.], [Dr. Sadler] found him to be a quite socially appropriate, pleasant and well-related young man." (Tr. 342, 385). He added, "[w]hile learning disabilities, language impairments, and perhaps interpersonal and social difficulties remain potential concerns . . . , these possibilities are not certain; while poor impulse control, decreased attention span and distractibility are seriously impairing conditions." (Id.). Dr. Sadler diagnosed plaintiff with ADHD, and he assigned him a GAF score of 45-60. (Tr. 342-

_____

[5]At the conclusion of the hearing, the ALJ left the record open for the submission of then-recent records from Middlesex Hospital. (Tr. 459-61).

43, 385-86).  Additionally, he recommended a trial of stimulant medication to treat T.H.'s ADHD, along with a reassessment of his cognitive and social functioning.  (Tr. 343, 386). He prescribed Concerta 18 mg.  (Id.).

Dr. Sadler saw T.H. on April 9, 2010, noting that T.H. was "astonishingly polite."  (Tr. 387-88).  Dr. Sadler increased T.H.'s dose of Concerta to 27 mg.  (Tr. 387).

On April 25, 2010, Elaine C. Melillo, LPC, T.H.'s counselor at the Family Advocacy Program at Middlesex Hospital completed a report of her Initial Evaluations, which occurred on February 12 and 26, 2010; the report is cosigned by Dr. Sadler.  (Tr. 345-49, 420-24). Melillo found T.H. to be "cooperative[,]" "impulsive, [and] very active[.]" (Tr. 348, 423).  His judgment "seem[ed] to be minimally impaired[,] . .  his memory [was] intact[,]" and his "insight seem[ed] age appropriate[.]" (Id.).  Melillo summarized that T.H. has a "significant" history of hyperactivity, impulsivity, distractibility, compliance, task completion and emotionality, and there are concerns related to his speech and language including stuttering and word repetition.  (Id.). T.H. was diagnosed with ADHD, combined type, and assigned a GAF score of 51. (Id.; see Tr. 344).

On April 29, 2010, a Function Report was completed by plaintiff on T.H.'s behalf (Tr. 231-40), in which she noted that T.H.'s ability to communicate is limited specifically in his ability to repeat stories, tell jokes accurately, and use sentences with "because," "what if," or "should have been," and he is limited in his ability to learn in that he cannot read capital letters and small letters, read simple words, read and understand simple sentences, read and understand stories in books or magazines, print letters, print his name, write in script, spell most three-to-four letter words, write a simple story, add and subtract numbers over ten, know the days of the week and months of the year, understand money and make correct

change, and tell time.  (Tr. 234-35).  Plaintiff also reported that T.H. loses his temper, which causes problems with teachers and with friends, but with his medication, he is able to socialize better with others.  (Tr. 237).  Additionally, T.H. is "not able to take care of all of his personal needs[,]" as he cannot tie his shoelaces, comb or wash his hair by himself, choose or hang his clothes, help around the house, do what he is told, obey safety rules, get to school on time, or accept criticism or correction.  (Tr. 238).  He is also not able to finish what he starts, work on arts and crafts projects, complete his homework, or complete chores.  (Tr. 239).

As of May 13, 2010, plaintiff reported that T.H. cannot hop on one foot without holding on, catch a large ball, write both his first and last names or print or write cursive well, unlock a key lock, know and name more than five colors, count to ten, fifty, one-hundred or more, listen to a story for ten minutes, read for fun by himself, know his telephone number, tell stories from memory, understand the use of money, run errands dependably, or buy things at a store alone.  (Tr. 241, 243).  T.H. does not take turns or share toys, he does not have a group of friends, he does not usually follow rules at home or at school, he does not give small gifts on his own at family birthdays, he does not have hobbies or belong to any groups or teams, and he does not go places with friends during the day without an adult.  (Tr. 242).  He cannot get a drink by himself, set a table without help, count change to $1.00, be trusted with money, make phone calls, or tell time in five minute segments.  (Id.).  His mother reports that he runs in the street and jumps off of things, and sometimes he will fight with his playmates.  (Tr. 243).  In school, he has "problems" reading, staying settled, and writing.  (Id.).

T.H. returned to Dr. Sadler on June 4, 2010, who noted "a slight increase in [T.H.'s]

7

stutter and perhaps greater irritability in the late afternoon." (Tr. 389-90, 391-92). T.H. was taking Methylphenidate, and a trial of Catapres was started. (Id.). On June 16, 2010, plaintiff reported to Dr. Sadler that "in the last several weeks, [T.H.] has been receiving splendid reports from school, showing much better behavior throughout the day[.]" (Tr. 393). T.H. was also prescribed high protein Ensure to address T.H.'s "dramatically decreased appetite and loss of weight." (Tr. 394). On July 16, 2010, Dr. Sadler opined that T.H. was experiencing "rebound after a vigorous day" and he started a trial of Ritalin to be taken in the afternoon. (Tr. 397-98). On July 28, 2010, T.H. was "doing well[,]" with Methylin each morning, Ritalin in the afternoon, and Catapres in the evening. (Tr. 395-96). On September 15, 2010, Dr. Sadler noted that T.H.'s GAF score was 63, that he has been "doing very well at his new school[,]" that he has gained weight, and that his mother tells the doctor that T.H. continues to stutter, but the doctor "has not heard" the stutter. (Tr. 399-400). A month later, on October 27, 2010, Dr. Sadler noted that the teachers "dramatically notice if a dose is missed in the morning, but if regularly administered, [T.H.] seems to be doing quite well in school." (Tr. 401-02).[6] He also noted that T.H. is "responsive to his mother's directions, in spite of his overt ADD symptoms." (Tr. 401). T.H. continued to do "splendidly" on his medication as of December 3, 2010. (Tr. 403-04).

On January 17, 2011, plaintiff noted to Dr. Sadler that "since the medication increase, previous behaviors, noted prior to the increase, have persisted[,]" but he seems to be doing "quite well[]" at school. (Tr. 405). Dr. Sadler opined that T.H.'s emotional reactivity appeared "possibly to be related to the higher dose of stimulants," which Dr. Sadler decided

---

[6]On November 12, 2010, T.H. was seen in the emergency room of Middlesex Hospital for diarrhea. (Tr. 428-35).

to treat with an increase in the Catapres.  (Tr. 406).[7]

On March 7, 2011, Dr. Sadler, Melillo and plaintiff agreed to a Behavioral Health Treatment Plan that reflected T.H.'s diagnosis of ADHD, combined type, which would be treated with individual therapy, school collaboration, medication, and parental support.  (Tr. 364-65).  On March 21, 2011, Dr. Sadler added Catapres to T.H.'s afternoon medication regime, so that he was now taking it three times a day.  (Tr. 407-08)  On May 2, 2011, Dr. Sadler noted that T.H.'s teacher reports that the medication's effectiveness fades by 1:00 p.m., such that Dr. Sadler decided to increase the morning dose of Metadate.  (Tr. 409-10). By May 23, 2011, T.H. was experiencing anxiety; Dr. Sadler substituted Strattera for Metadate in the morning.  (Tr. 411-12).  On June 15, 2011, plaintiff informed Dr. Sadler that once T.H. finishes an assignment, he becomes "quite active and increasingly impulsive."  (Tr. 413-14).  Dr. Sadler maintained the Ritalin and Catapres, and increased the Strattera to 36 mg in divided doses.  (Id.).  A month later, on July 18, 2011, Dr. Sadler discussed T.H.'s anxiety and mood as a side effect of the medications.  (Tr. 415-16).  His symptoms suggested a dysthymic disorder and anxiety, for which he prescribed 12.5 mg of Zoloft. (Id.).  On July 27, 2011, plaintiff reported that T.H. seemed "less sad . . ., not as quiet and not as scattered."  (Tr. 417-18).  Dr. Sadler increased the dose of Zoloft to 25 mg.  (Id.). By September 19, 2011, both plaintiff and T.H. reported that "things [were] going quite well."  (Tr. 418-19).  No medication changes were made.  (Id.).   On November 28, 2011, Dr. Sadler again increased the dose of Zoloft to 37.5 mg.  (Tr. 442-43). During his visit on January 9, 2012, Dr. Sadler noted that T.H. was "calm, settled, focused and responsive[,]" and "[w]hile his stutter was more pronounced than usual, his answers were more pertinent,

---

[7]A month later, on February 25, 2011, Dr. Kevin P. Baruzzi saw T.H. for pain in his bilateral lower legs.  (Tr. 419; see also Tr. 436).  He was diagnosed with acute myositis.  (Tr. 419).

full and helpful than is usual." (Tr. 444-45).  Dr. Sadler increased the dose of Zoloft to 50 mg.  (Id.).

C. SCHOOL RECORDS

1. PRE-ONSET DATE OF DISABILITY (PRE-JANUARY 2010)

In his 2008-2009 school year report card for September through March of that year (Tr. 106-07), T.H.'s kindergarten teacher at Wilbur Snow Elementary School in Middletown noted that T.H.'s "behavior impedes much of his learning and social interactions with other children[,]" and his "tantrums have become increasingly longer and directly affect [his] work as he becomes frustrated with his lack of focus and frequent time outs." (Tr. 107).  On January 14, 2009, an Intervention Plan was put in place to teach T.H. strategies to reduce his stuttering and to "target appropriate use[]" of language.  (Tr. 108; see Tr. 109-16). Planning and Placement Team meetings were scheduled for April 24, 2009 and June 19, 2009. (Tr. 117-21).   On April 24, 2009, the areas of concern identified were  academic, social/emotional, behavioral, and communication.  (Tr. 122-23; see also Tr. 124-45).

T.H. transferred to Memorial Elementary School in East Hampton on May 8, 2009. (See Tr.  293).  On May 14, 2009, a request for student assistance was submitted on T.H.'s behalf for speech and language, behavior, compliance, attention to task and task completion, impulsivity, emotionality, aggression, reading, writing and math. (Tr. 126; see Tr. 127).  On May 26, 2009, a Tier III intervention meeting was held.  (Tr. 128-34; see Tr. 328-29).  On June 2, 2009, his progress was monitored  (Tr. 135-36), and later that month, the special education teacher completed an assessment in which she noted that T.H. demonstrated weakness in Letter Identification, Letter Sounds, Sight Words, Rhyming, and Written Expression, as well as in numeral names, matching numerals to sets, numeral writing, rote counting, money, vocabulary and concepts. (Tr. 137-40; see also Tr. 141-44, 152-53, 325-

10

26).

In September 2009, T.H. returned to Snow Elementary in Middletown, and on September 18, 2009 a PPT was held. (Tr. 153-66; see also Tr. 294). T.H. was evaluated by the school social worker, Jeannine Zinck, on October 9, 2009, who noted T.H.'s "difficulty transitioning out of the class through the hallways[,]" and his need for redirection by his classroom teacher. (Tr. 168-69). On October 20, 2009, Zinck noted that T.H. was "considered for retention last year but [his] mother felt that she did not want the 'social stigma' of retention to affect him." (Tr. 170; see Tr. 170-73). Behavioral strategies for T.H. were updated on October 23, 2009. (Tr. 174-77). A second PPT was held on November 5, 2009. (Tr. 178-83; see Tr. 165-67). On the same day, a Report of Psychological Evaluation was completed by the school psychologist in Middletown Public Schools (Tr. 330-35), in which she noted that there were "[c]linically [s]ignificant results" in the areas of hyperactivity, learning problems, atypicality, and adaptability. (Tr. 333). Additionally, T.H. has difficulty listening, paying attention and understanding. (Id.). A Speech-Language Evaluation Report, also dated November 5, 2009, revealed that T.H.'s single word vocabulary skills were "within the average range of performance[,]" as are his expressive and receptive language skills, although his stuttering was "[a]n area of continued concern[.]" (Tr. 336-37).

### 2. POST-ONSET DATE OF DISABILITY

T.H.'s 2009-2010 report card for first grade reflects that he is "well below grade level in reading[,]" he "complains he does not know the . . . sound a letter makes[,]" and he "shows little self-control[.]" (Tr. 184-85; see Tr. 186-219, 286-90). Lisa Murdy, his first grade teacher that year, and Jim Gaudreau, the Principal, completed a Teacher Questionnaire on May 20, 2010 (Tr. 244-54), in which they opined that T.H. has a "very serious problem" reading and comprehending written material, and expressing ideas in a written form; he has

an "obvious problem" comprehending oral instructions, understanding school and content vocabulary, understanding and participating in class discussions, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class discussions; and he has a "slight problem" comprehending and doing math problems.  (Tr. 245).  According to Murdy, T.H. was reading at a kindergarten level independently, but first grade material must be read to him.  (Id.).  They included that he has "great difficulty doing tasks independently[,]" and was "significantly below grade level." (Id.).  Additionally, T.H. has a "very serious problem" focusing long enough to finish assigned tasks or activities, refocusing to task when necessary, working without distracting self or others, and working at a reasonable pace; he has a "serious problem" completing class/homework assignments; he has an "obvious problem" paying attention when spoken to, carrying out multi-step instructions, waiting to take turns, and completing work accurately without careless mistakes; and he has a "slight problem" carrying out single-step instructions and organizing his own things.  (Tr. 246).  Murdy explained that T.H. is "not very independent when doing tasks[,]" and he has "difficulty writing because of his lack of knowledge of high frequency words." (Tr. 247).  According to Murdy, with medication T.H.'s focus was "much better and [his] completion of tasks [had] become much better," although he was still below grade level. (Id.).

In addition, T.H. has a "serious problem" asking permission and following rules; he has an "obvious problem" making and keeping friends, seeking attention appropriately, and expressing anger appropriately; and he has a "slight problem" playing cooperatively with other children, respecting/obeying adults, taking turns in conversation, and interpreting the meaning of facial expressions.  (Tr. 248).  Murdy can understand almost all of his speech, and T.H. has no problem moving about and manipulating objects.  (Tr. 249).  However, T.H.

12

has a "serious problem" handling frustration appropriately, and he has an "obvious problem" calming himself when upset or excited, being patient, and using appropriate coping skills. (Tr. 251). He has a "slight problem" identifying and asserting emotional needs, and responding appropriately to changes in mood.  (Id.).   T.H. will "grunt at the teacher if he [does not] like a direction or correction[,]" and he will "badger to get what he wants."  (Id.). He has a "speech problem when he gets excited and has a tendency to repeat phrases multiple times until he can find the words to express himself."  (Tr. 254).

On October 8, 2010, Gaudreau completed a second Teacher Questionnaire for SSA (Tr. 260-70), in which he noted that, at that time, T.H. was in first grade and was in "mainstream regular education classes."  (Tr. 260).  In the domain of acquiring and using information, he opined that T.H. has a "very serious problem" reading and comprehending written material, comprehending and doing math problems, expressing ideas in written form, and recalling and applying previously learned material; he has a "serious problem" understanding school and content vocabulary, providing organized oral explanations and adequate descriptions, learning new material, and applying problem-solving skills in class discussions; and he has an "obvious problem" comprehending oral instructions and understanding and participating in class discussions. (Tr. 261).  According to Gaudreau, T.H. "lacks independence in completing most academic tasks[,]" and he is "below his peers in reading, writing, and math."  (Id.).

In the domain of attending and completing tasks, T.H. has a "very serious problem" on an hourly basis with focusing long enough to finish assigned tasks, refocusing when necessary, carrying out multi-step instructions and waiting to take turns, organizing his things, completing assignments, working without careless mistakes, working without

distracting himself or others, and working at a reasonable pace. (Tr. 262). Additionally, he has a "serious problem" on a daily basis carrying out single-step instructions and changing from one activity to another, as well as an "obvious problem" on a daily basis with paying attention when spoken to directly, and sustaining attention during play. (Id.).

In the domain of interacting and relating with others, he has a "very serious problem" relating experiences and telling stories, and taking turns in conversation; he has a "serious problem" seeking attention appropriately, asking permission appropriately, introducing and maintaining relevant and appropriate topics of conversation, and using adequate vocabulary and grammar to express thoughts and ideas; and he has an "obvious problem" expressing anger appropriately, following rules, using language appropriately, and interpreting the meaning of facial expression, body language, hints and sarcasm. (Tr. 264). He also has a "slight problem" playing cooperatively with other children, making and keeping friends, and respecting/obeying adults in authority. (Id.).

Gaudreau noted that he, as a "familiar listener," could understand one-half to two-thirds of the child's speech when the conversation is known, unknown, or repeated. (Tr. 265). According to Gaudreau, T.H. has a "very serious problem" being patient when necessary and knowing when to ask for help; he has a "serious problem" using appropriate coping skills to meet daily demands of the school environment; and he has an "obvious problem" "calming [himself] when upset or overly excited[,]" handling frustration appropriately, identifying and asserting emotional needs, and responding appropriately to changes in his own mood. (Tr. 267). Additionally, when T.H. is "not on medication, [he] cannot focus on simple tasks[.]" (Tr. 268). However, Gaudreau indicated that T.H. does not have any problem moving and manipulating objects (Tr. 265-66), and he has no problem

14

taking care of personal hygiene, caring for physical needs, cooperating in taking medication, using good judgment about personal safety, and avoiding dangerous substances.  (Tr. 267).

In the 2010-2011 school year, in which T.H. repeated his first grade year, T.H. underwent multiple assessments to improve his reading.  (Tr. 279-85; see Tr. 294).  His 2010-2011 report card (Tr. 291-92) reveals that T.H. was having "a successful year . . . following the routine[,]" and T.H. was "well liked and accepted by his classmates."  (Tr. 292). In the first marking period, he was below level in reading; he had difficulty decoding words; and he needed teacher support when writing.  (Tr. 292).  In the second marking period, "[r]eading continue[d] to be a major struggle for him[,]" he was reading significantly below grade level, and he "should [have been] showing more progress."  (Id.).  On March 17, 2011, T.H. was evaluated by the Middletown Public Schools Department of Pupil Services.  (See Tr. 293-305).  T.H. had been receiving "intensive intervention services in reading and math since his Kindergarten year[;]" he was working on "speaking strategies with the Speech and Language Pathologist and [was receiving] emotional support from the School Psychologist[,]" yet, "[d]espite rigorous intervention and support, [he was] making slow progress toward grade level expectations, most noticeably in reading and writing."  (Tr. 303).  Another PPT meeting was held on March 28, 2011. (Tr. 306-22).  In the last quarter of T.H.'s 2010-2011 school year (Tr. 323-24), his teacher noted that he was "still significantly below grade level." (Tr. 324).

Amy Barron, the school psychologist at Snow Elementary School, completed a Report of Psychological Evaluation on March 28, 2011 (Tr. 366-72), in which she noted T.H.'s stuttering and disfluency.  (Tr. 367).  At that time, T.H. was repeating the first grade.  (Tr. 371).   His overall cognitive ability fell within the average range, as did his verbal

comprehension, perceptual reasoning, and processing speed.  (Tr. 371-72).  His rapid naming and working memory fell within the low average range, which is reflective of his ability "to hold information in conscious awareness, perform some operation with it, and produce a result."  (Tr. 372).  He has weaknesses in verbal concept formation and phonological awareness, and his ability to manipulate sounds by deleting sounds from words is "well below the average range."  (Id.).  Additionally, T.H. is in the "[c]linically [s]ignificant range on the Internalizing Problems Composite and on scales measuring [a]nxiety, [d]epression, and [l]earing [p]roblems with elevated scores in the [a]t-[r]isk range yielded on the [s]chool [p]roblems [c]omposite[,]" as well as in "scales measuring [s]omatization, [a]typicality, [w]ithdrawal, and [a]daptability."  (Id.).  T.H.'s anxiety and depression were of "most concern[.]" (Id.).

On the same day, Roseanne Kiczuk, M.S, CF-SLP, completed a Speech-Language Evaluation Report of T.H. (see Tr. 373-80), in which she noted that his stuttering is "severe" (Tr. 376), such that it impacts "his communication with the teacher and his classmates."  (Tr. 377). She also noted that T.H. has "severe disfluency."  (Tr. 379).  She concluded that she has "significant concerns" with T.H.'s "ability to produce fluent speech within the academic setting."  (Tr. 380).

D. MEDICAL OPINIONS

Dr. Sadler and Melillo completed a disability assessment for the State of Connecticut Disability Determination Services ["Connecticut DDS"] on May 13, 2010, in which they noted that they treat T.H. on a weekly basis with individual and family therapy, as well as medication management with 20 mg of Ritalin.  (Tr. 350-53).  The Ritalin increased T.H.'s "ability to focus [and] stay on task."  (Tr. 351). T.H. is "[i]mpulsive [and] mildly

16

hyperactive[,]" but there are "no signs of aggression, tantrums or conduct problems[,]" and his speech is "[g]enerally understandable[,]" with "some stuttering [and] word repetition." (Id.).  T.H.'s mood is eurythmic and there is "evidence of a mood disorder[,] low frustration tolerance[,] [and] irritability[.]" (Tr. 352).  Additionally, T.H. exhibits distractibility and impulsivity which "at times interferes with [his] peer relationships primarily at school." (Id.). His ability to accomplish tasks considering his concentration, persistence and pace is interfered by his ADHD symptoms. (Tr. 353).

On June 9, 2010, Kirk Johnson, PsyD, completed a Childhood Disability Evaluation of T.H. for SSA in which he concluded that T.H. has a "[l]ess [t]han [m]arked" limitation in acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for oneself, and he has "[n]o [l]imitation" moving about and manipulating objects and in his health and physical well-being. (Tr. 34-35).[8]

Dr. Sadler completed another disability report on behalf of T.H. on October 27, 2010. (Tr. 355-58).  At that time, T.H. was taking Methylphenidate and Catapres. (Tr. 355). Dr. Sadler noted that T.H. was making "[g]ood progress" at school with his medication, although he continued to "show poor focus and no impulse control[,] [and he was] not aggressive." (Id.)(emphasis in original).  Dr. Sadler noted that T.H.'s speech was "normal, high pitched[,]" and his mood was "[e]urythmic, exuberant, [and] flighty[,]" and he had poor focus, impaired judgment and poor insight. (Tr. 356).  Additionally, according to Dr. Sadler, T.H. also has a "[s]erious [p]roblem" using good judgment regarding safety, using appropriate coping skills, and handling frustration appropriately, as well as an "[o]bvious [p]roblem" taking care of personal hygiene and caring for his physical needs. (Id.).

---

[8]On November 16, 2010, Pamela Fadakar, PsyD, also evaluating T.H. on behalf of SSA, reached the same conclusions as Kirk Johnson. (Tr. 43-44).

T.H. also has a "[v]ery [s]erious [p]roblem" handling frustration appropriately, and a "[s]erious [p]roblem" interacting appropriately with others in a school environment, getting along with others without distracting them, carrying out multi-step instructions, focusing long enough to finish assigned simple tasks, changing from one simple task to another, and performing school activities at a reasonable pace.  (Tr. 357).  In addition, T.H. has an "[o]bvious [p]roblem" asking questions or requesting assistance, respecting and responding appropriately to authority, carrying out single-step instructions, and performing school work activity on a sustained basis. (Id.).

A week later, on November 5, 2010, Dr. Sadler and Melillo completed another assessment of T.H. for the Connecticut DDS, in which they reported almost identical information.  (Tr. 360-63).  At that time, T.H. was taking Methylphenidate, Methylin, and Catapres, and Ensure for his weight loss from Ritalin. (Tr. 360).  As T.H.'s classroom teacher reported, T.H. had an "increased ability to focus [and] stay on task." (Tr. 361).  Just as they had noted in May 2010, the treating providers again noted that T.H. was impulsive and "mildly hyperactive" but had no signs of aggression, tantrums, or conduct problems.  (Id.; see Tr. 351). Similarly, his speech continued to be "[g]enerally understandable" with "[e]nunciation impaired to a degree[,]" and there was "some stuttering [and] word repetition." (Id.).  Also, just as in May, T.H.'s mood was eurythmic and there was "evidence of a mood disorder[,] low frustration tolerance[,] [and] irritability[.]" (Id.; see Tr. 352). Additionally, as in May, T.H. exhibited distractibility and impulsivity which "at times interfere[d] [with] his peer relationships primarily at school." (Tr. 362).  Additionally, his ability to accomplish tasks considering his concentration, persistence and pace was interfered by his ADHD symptoms.  (Tr. 363; see Tr. 353).

On January 30, 2012, Dr. Sadler completed a Medical and Functional Capacity Assessment of T.H. for SSA (Tr. 437-41), in which he diagnosed T.H. with dysthymic disorder, ADHD, and generalized anxiety disorder. (Tr. 437).  Dr. Sadler described T.H. as having a decreased attention span, easy distractibility, poor impulse control, inhibitions of activities, a sad affect for more than one year, hyperactivity, self deprecating verbalizations, impaired social skills, and crying for no reason. (Tr. 437).  According to Dr. Sadler, T.H. has an extreme level of impairment in caring for himself, as well as a marked level of impairment in the domains of acquiring and using information, attending and completing tasks, interacting and relating to others, and health and physical well-being. (Tr. 439-41).  Dr. Sadler also opined that he has a moderate level of impairment in the domain for moving about and manipulating objects, and an extreme level of limitation in the domain of caring for yourself. (Tr. 440).

### III. STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.   Second, the court must decide whether the determination is supported by substantial evidence. See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp.2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp.

421, 423 (S.D.N.Y. 1977)(citations omitted).   However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.   See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted).   Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings.   See id. Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.   See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

To determine if a child claimant has sustained a disability within the meaning of the Act, the ALJ follows a three-step process.   First, the ALJ must determine if and when the child last engaged in substantial gainful activity.   See 20 C.F.R. § 416.924(b).   Second, if, as in most cases, the child has not engaged in substantial gainful activity, the ALJ must determine whether the child has an impairment or combination of impairments that is severe within the meaning of the regulations.   See 20 C.F.R. §  416.924(c).   Third, if the child has a severe impairment or combination of impairments, the ALJ must determine whether the child's impairment(s) meets or functionally equals the severity of any disorder in the Listings. See 20 C.F.R. § 416.924(d). To determine if an impairment or combination of impairments functionally equals a listed impairment, the ALJ must find that the impairment or impairments result in "marked" limitation in two domains of functioning or "extreme" limitation in one. See 20 C.F.R. § 416.926a(a).[9] The six domains to consider are the child's ability to (1)

---

[9]A child experiences a "marked" limitation where the impairment(s) seriously interferes with his ability to independently initiate, sustain, or complete activities. See 20 C.F.R. § 416.926a(e)(2). An "extreme" limitation occurs where the child's impairment(s) interferes very seriously with his ability to independently initiate, sustain, or complete activities. See 20 C.F.R. § 416.926a(e)(3).

acquire and use information; (2) attend to and complete tasks; (3) interact with and relate to others; (4) move about and manipulate objects; and (5) care for oneself; and the child's (6) health and physical well-being.  See 20 C.F.R. § 416.926a(b)(1)(i)-(vi). To evaluate the severity of the impairment in these six domains, the ALJ measures the child's independent ability to function against that of non-impaired children of the same age. See 20 C.F.R. § 416.926a(b).

## IV.  DISCUSSION

In his decision, the ALJ concluded that T.H., a school-age child, has not engaged in substantial gainful activity since April 29, 2010, the date his application for benefits was filed. (Tr. 17; see 20 C.F.R. §§ 416.926a(g)(2), 416.924(b), and 416.971 et seq.).  The ALJ then found that T.H. has the following severe impairments: ADHD, anxiety, and a dysthymic disorder (id.; see 20 C.F.R. § 416.924(c)), but his impairment or combination of impairments do not meet or medically equal the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, App. 1. (Tr. 17-27; see 20 C.F.R. §§ 416.924, 416.925 and 416.926). Specifically, the ALJ concluded that T.H. has a less than marked limitation in acquiring and using information (Tr. 22-23); he has a marked limitation in attending and completing tasks (Tr. 23-24); he has a less than marked limitation in interacting and relating to others (Tr. 24-25); he has no limitation in moving about and manipulating objects (Tr. 25); he has a  less than marked limitation in the ability to care for himself  (Tr. 25-26); and he has a less than marked limitation in health and physical well-being.  (Tr. 26-27).   Accordingly, the ALJ concluded that T.H. has not been disabled since April 29, 2010, the date the application was filed.  (Tr. 27).

Plaintiff contends that the ALJ erred at Step Two of the sequential analysis by not

finding that severe disfluency is a severe impairment (Dkt. #13, Brief at 4-11), and the ALJ failed to accord T.H.'s treating physician's opinions the requisite weight and deference, he failed to provide good and sufficient reasons for discounting those opinions, and he substituted his own opinion for that of the medical expert. (Id. at 11-16).  Additionally, plaintiff takes issue with the ALJ's treatment of three of the six domains: the ALJ erred in finding a "less than marked limitation" in the domain of caring for oneself, as the record supports a finding of either a "marked" or an "extreme" limitation in this domain (id. at 16-21); the ALJ erred in finding a "less than marked limitation" in the domain of interacting and relating to others, as the record supports a finding of a "marked limitation" in this domain (id. at 21-23); and the ALJ erred in finding a "less than marked limitation" in the domain of acquiring and using information, as the record supports a finding of a "marked limitation" in this domain.  (Id. at 23-26).[10]

Defendant counters that substantial evidence supports the ALJ's determination that T.H. was not affected by severe speech disfluency (Dkt. #18, Brief at 4-6); substantial evidence supports the ALJ's functional equivalence analysis in that the ALJ properly discredited Dr. Sadler's opinion (id. at 6-9); and substantial evidence supports the ALJ's findings that T.H. has "less than marked" limitations in his ability to care for himself, in his ability to interact and relate to others, and in his ability to acquire and use information. (Id. at 10-13).

A. SEVERITY DETERMINATION AND MEDICAL OPINIONS

For a child to qualify for childhood disability benefits, the child

must have a medically determinable impairment(s) that is severe. If [the

---

[10]Plaintiff did not pose this argument to the Appeals Council. (See Tr. 446-53).

child] do[es] not have a medically determinable impairment, or [the] impairment(s) is a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations, [SSA] will find that [the child] do[es] not have a severe impairment(s) and [is], therefore, not disabled.

20 C.F.R. § 416.924(c).  Plaintiff contends that the ALJ erred in failing to find that T.H.'s speech disfluency is a severe impairment.  (Dkt. #13, Brief at 4-11).

Plaintiff's treating physician, Dr. Sadler, while noting the existence of speech impediments, never diagnosed T.H. with disfluency; rather, he repeatedly diagnosed him with ADHD, anxiety, and dysthmic disorder.  (See Tr. 355-56, 437).  That said, however, Dr. Sadler was cognizant of T.H.'s speech issues, and in fact, when he began treatment of T.H. in March 2010, he noted that "[T.H.'s] language has been studied by experts[,]" namely the school professionals.  (Tr. 340).  Additionally, Dr. Sadler's treatment notes do reflect issues relating to T.H.'s speech and learning abilities.  Specifically, in March 2010, when he completed his first Psychiatric Evaluation Report of T.H., upon which he relied on  "[m]edical record[s], school records, [the] parent, [T.H.], and therapists[,]" (Tr. 338), Dr. Sadler noted that "[w]hile learning disabilities, language impairments, and perhaps interpersonal and social difficulties remain potential concerns . . . , these possibilities are not certain[.]" (Tr. 342-43, 385-86)(diagnosis of ADHD). A month later, Melillo and Dr. Sadler summarized that T.H. has a "significant" history of hyperactivity, impulsivity, distractibility, compliance, task completion and emotionality, "as well as concerns related to his speech and language including stuttering and word repetition." (Tr. 348, 423; see Tr. 344).  In May, they noted that T.H.'s speech was "[g]enerally understandable[,]" (Tr. 351; see also Tr. 361), but a month later, in June 2010, Dr. Sadler noted "a slight increase in [T.H.'s] stutter and perhaps greater irritability in the late afternoon."  (Tr. 389-90, 391-92).  In September 2010, Dr.

Sadler noted that his mother tells the doctor that T.H. continues to stutter, although the doctor "has not heard" the stutter.  (Tr. 399-400).

Approximately six months later, in March, 2011, Dr. Sadler, Melillo and plaintiff agreed to a Behavioral Treatment Plan which reflected T.H.'s diagnosis of ADHD, combined type, rule out learning disorder NOS.  (Tr. 364-65).  Dr. Sadler attributed the "reported concerns regarding reversing letters and numbers and reading and writing[]" to his diagnosis.  (Id.).  Throughout Dr. Sadler's treatment notes, T.H.'s anxiety is addressed, and his ADHD is treated through medication management.  (See, e.g., Tr. 407-10 (increased Metadate), 411-12 (anxiety; substituted Strattera for Metadate); 413-14 (maintained Ritalin and Catapres, and increased Strattera); 415-16 (discussed T.H.'s anxiety and mood as a side effect of the medications; Zoloft was prescribed for dysthymic disorder and anxiety)).  In July 2011, Dr. Sadler posed a question to T.H. about the "worst day . . of last week," in response to which T.H. whispered, "I can't say." (Tr. 415).  Dr. Sadler then noted that "[t]his suggested a reframe of my understanding of [T.H.]; and while there is considerable anxiety and difficulty with fluently conversing," he was able to understand what T.H. was saying and he "discussed at some length[]" with plaintiff ways to "facilitate [T.H.'s] reporting how he feels[.]"  (Id.).   During his visit in January 2012, Dr. Sadler noted that T.H. was "calm, settled, focused and responsive[,]" and "[w]hile his stutter was more pronounced than usual, his answers were more pertinent, full and helpful than usual."  (Tr. 444). Again, Dr. Sadler attributed this to T.H.'s anxiety and he increased the dose of Zoloft.  (Tr. 444-45).

Plaintiff's school records, however, paint a clearer picture of T.H.'s speech issues.  As T.H.'s school records reflect, T.H. becomes "frustrated when he is disfluent[,]" (Tr. 108), his "communication" is a major area of concern (Tr. 122), he has difficulty with oral fluency (Tr.

24

129), he gets "stuck on his words[,]" (Tr. 172), decoding new words is "very difficult[,]" (Tr. 185), "[T.H.] does have a speech problem when he gets excited and has a tendency to repeat phrases multiple times until he can find the words to express himself[,]" (Tr. 254), and T.H. "frequently stutters[.]" (Tr. 336).  Additionally, Amy Barron, the school psychologist noted T.H.'s stuttering and disfluency (Tr. 367; see Tr. 366-72), and Roseanne Kiczuk, who completed a Speech-Language Evaluation Report of T.H. (Tr. 373-80), noted that his stuttering is "severe" (Tr. 376), and that T.H. has "severe disfluency." (Tr. 379).   T.H.'s teacher in the 2009-2010 school year noted that T.H. is "well below grade level in reading[,]" and he "complains he does not know the . . . sound a letter makes[;]" however, she also noted that she can understand almost all of his speech.  (Tr. 184-85, 249).  Similarly, in a progress report note in the 2010-2011 school year, T.H.'s teacher noted that T.H. "can orally tell a good story, but has difficulty putting his thoughts on paper." (Tr. 324).  However, in the March 2011 Speech-Language Evaluation Report, the two speech-language pathologists noted that T.H.'s "utterances, along with the frequency of stuttering and secondary characteristics, impacted [his] ability to successfully and efficiently convey his message." (Tr. 378).  He "stuttered on [eighteen] out of the [nineteen] sentences[,]" and although his "story and dialogue were creative and linguistically appropriate[,] . . . his severe stuttering and secondary behavior greatly impacted his ability to convey his message clearly and without noticeable frustration." (Tr. 378-79).  The results of the testing revealed that T.H.'s "speech fluency skills are significantly impaired."  (Tr. 379).

     In his decision, the ALJ limited his analysis of T.H.'s speech impairment to noting that T.H. "was also found to have difficulty with speech and language skills[,]" (Tr. 19), and that "Dr. Sadler noted the claimant continued to have language difficulties[.]"  (Tr. 20).   If the

ALJ "incorrectly appl[ied] the step two legal standard, [such finding] is harmless error, when some of a claimant's impairments are determined to be severe and others not[.]" <u>Jones-Reid</u> <u>v. Astrue</u>, 934 F. Supp. 2d 381, 402 (D. Conn. 2012)(citation omitted), <u>aff'd</u>, 515 F. App'x 32 (2d Cir. 2013). "[B]ecause the ALJ did find several severe impairments and proceeded in the sequential process, all impairments, whether severe or not, were considered as part of the remaining steps." <u>Id.</u> In this case, the "remaining steps" were the ALJ's consideration of the six domains.  Two of the three domains at issue in this case, the domain of interacting and relating to others and the domain of caring for oneself, are directly related to the issue of T.H.'s speech; thus, the ALJ's treatment of the record, Dr. Sadler's opinions, and the opinions of the school experts as they relate to these domains are directly relevant to determining whether the ALJ did consider all of T.H.'s impairments in the remaining consideration of the domains at issue, and whether the ALJ afforded proper weight to the opinions of record. (<u>See</u> Tr. 24).

### B.  ANALYSIS OF DOMAINS

A child's "impairment(s) is of listing-level severity if [the child has] 'marked' limitations in two of the domains . . ., or an 'extreme' limitation in one domain."  20 C.F.R. § 416.926a(d).  In this case, the ALJ concluded that T.H. has a marked limitation in the domain of attending and completing tasks (Tr. 24)(emphasis omitted), but concluded that he has a less than marked limitation in interacting and relating to others, acquiring and using information, and in his health and physical well-being, as has no limitation in moving about and manipulating objects.  (Tr. 22-27).

### 1. DOMAIN OF INTERACTING OR RELATING WITH OTHERS

As stated above, in his decision, the ALJ concluded that T.H. "has less than marked

limitation in interacting and relating with others." (Id.)(emphasis omitted).  He bases his conclusion on the fact that "[a]ltough [T.H.'s] recent school records indicate that he has some trouble with others due to hyperactivity, [T.H.] is described as well liked and accepted by his classmates[,]" and "Dr. Sadler had repeatedly noted that [T.H.] is not aggressive and is respectful, easy to work with and has a good attitude[.]" (Tr. 24-25).  Over the course of his treatment of T.H., Dr. Sadler's notes reflect improvement with medication alterations, and frequent comments relating to how polite and well-mannered T.H. is.  (See, e.g., Tr. 342, 387 (T.H. is "astonishingly polite[]"), 393, 401, 409).  However, over time, Dr. Sadler's notes reflect his understanding that T.H. has significant levels of anxiety and depression (see Tr. 415), questionable learning disabilities (Tr. 352, 362), and "a possible obsessive-compulsive disorder type condition[.]" (Tr. 442). Ultimately, on January 30, 2012, Dr. Sadler opined that T.H. has a marked level of impairment in the domain interacting and relating to others. (Tr. 440-41). "The opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with the other substantial evidence." Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999)(citations omitted); see also 20 C.F.R. § 416.927(c)(2)(formerly § 416.627(d)(2)).  Additionally, "[i]n analyzing a treating physician's report, the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion."  Id. at 79 (internal quotations & multiple citations omitted).  The foregoing assessments are all consistent with the school records, and are not reflected in the ALJ's assessment of this domain.

Additionally, this domain is not as limited as the ALJ assessed.  Pursuant to the Regulations, interacting and relating with others means "initiating and responding to exchanges with other people[,]" and "forming intimate relationships . . . and sustaining them

over time."  20 C.F.R. § 416.926a(i)(1)(i)-(ii). The Regulations continue:

> Interacting and relating require you to respond appropriately to a variety of emotional and behavioral cues.  You must be able to speak intelligibly and fluently so that others can understand you; participate in verbal turntaking and nonverbal exchanges; consider others' feelings and points of view; follow social rules for interaction and conversation; and respond to others appropriately and meaningfully.

20 C.F.R. § 416.926a(i)(1)(iii).  Moreover, limited functioning in this domain can result if: "(v) You have difficulty communicating with others; e.g., in using verbal and nonverbal skills to express yourself, carrying on a conversation, or in asking others for assistance[, and/or] (vi) You have difficulty speaking intelligibly or with adequate fluency."  20 C.F.R. § 416.926a(i)(3).  For school-age children, "[the claimant] should be able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand."  20 C.F.R. § 416.926a(2)(iv).  Thus, while the ALJ relied on Dr. Sadler's assessment of T.H.'s lack of aggression and respectful nature, the record of T.H.'s communication issues as they relate to this domain, is much more involved.

As discussed above, when Dr. Sadler began treatment of T.H. in March 2010, he noted that "[T.H.'s] language has been studied by experts[,]" namely the school professionals.  (Tr. 340; see also Tr. 338 (reliance on school records)).  The records include the detailed expert evaluations of T.H.'s speech impairment, which evaluations the ALJ erred in failing to reference as they related to this, and other domains, and as they impact the identification of the severity of T.H.'s speech impairment.  See 20 C.F.R. § 416.924a(b)(7)(i) ("[I]f you attend school . . ., the records of people who know you or who have examined you are important sources of information about your impairment(s) and its effects on your functioning. Records from physicians, teachers and school psychologists, . . . or speech-language therapists are examples of what we will consider."); see, e.g., Frye v. Astrue, 485

28

F. App'x 484, 487-88 (2d. Cir. 2012)(reliance on "educational evidence in the record–including evaluations, reports and behavioral assessments from [the claimant's] teachers, counselors, school psychologists, and outside consultants"); Brown ex rel. JK v. Astrue, 306 F. App'x 636, 638 (2d Cir. 2009)(relying on school psychologist's findings which the ALJ was entitled to credit).  As discussed above, these experts, who include the school psychologist and the speech pathologist, both offered extensive opinions about T.H.'s stuttering and disfluency. (See Tr. 367, 376, 379).  Additionally, in October 2010, T.H.'s principal noted that T.H. has a "very serious problem" relating experiences and telling stories, and taking turns in a conversation, and he has a "serious problem" seeking attention appropriately, asking permission appropriately, introducing and maintaining relevant and appropriate topics of conversation, and using adequate vocabulary and grammar to express his thoughts and ideas in general, everyday conversation.  (Tr. 264, 270).  The ALJ discounted these opinions, giving them "limited weight . . . because they were completed when . . . [T.H.] had only recently begun taking medication and [T.H.'s] more recent 2010 to 2011 grade 1 progress report indicates he made great improvement while on medication." (Tr. 21).  However, while the record reveals some improvement in T.H.'s behavior once on medication, the ALJ did not explain how the medication improved his language fluency, and the record shows no evidence to support such a correlation. The two speech-language pathologists noted that T.H.'s "utterances, along with the frequency of stuttering and secondary characteristics, impacted [his] ability to successfully and efficiently convey his message[,]"  (Tr. 378), and in the March 2011 Speech-Language Evaluation Report, it is noted that although his "story and dialogue were creative and linguistically appropriate[,] . . . his severe stuttering and secondary behavior greatly impacted his ability to convey his message clearly and without

noticeable frustration." (Tr. 378-79).   The results of the speech pathology testing revealed that T.H.'s "speech fluency skills are significantly impaired." (Tr. 379).   Additionally, the March 2011 grade report reveals that "[T.H.'s] speech is also getting in the way of participating in group settings.   At times, it takes [T.H.] a while before he can get out his thoughts . . . . The children are beginning to notice and lose patience." (Tr. 292); see 20 C.F.R. § 416.924a(b)(7)(ii)("If you go to school . . ., we will ask your teacher(s) about your performance in your activities throughout your school day. We will consider all the evidence we receive from your school, including teacher questionnaires, teacher check lists, . . . and report cards.").

Similarly, although Melillo and Dr. Sadler noted that T.H. is "[g]enerally understandable[,]" they also expressed "concerns related to his speech and language including stuttering and word repetition." (Tr. 348, 423, 351; see Tr. 344).   In July 2011, Dr. Sadler included in his notes an exchange with T.H. which revealed his "difficulty with fluently conversing[.]" (Tr. 415).   Dr. Sadler expressed his concern over T.H.'s "considerable anxiety" and he "discussed at some length[]" with plaintiff ways to "facilitate [T.H.'s] reporting how he feels[.]"   (Id.). Dr. Sadler and Melillo noted that T.H.'s distractibility and impulsivity "at times" interfere with his "peer relationships primarily at school." (Tr. 352). Dr. Sadler also opined that T.H. has a "[s]erious [p]roblem" interacting appropriately with others in a school environment and getting along with others without distracting them or exhibiting behavioral extremes, as well as an "[o]bvious [p]roblem" asking questions or requesting assistance, and respecting and responding appropriately to authority. (Tr. 357). Moreover, after treating T.H.  for nearly two years, in January 2012, Dr. Sadler noted that plaintiff has impaired social skills, and a marked impairment in the domain of interacting and

relating to others.  (Tr. 440).  Unlike the opinions of the state agency reviewing physicians, Kirk Johnson, PsyD and Pamela Fadakar, PsyD, who concluded that T.H. has a "[l]ess [t]han [m]arked" limitation in interacting and relating with others (see Tr. 34-35, 43-44), the opinions of Dr. Sadler, and the school principal, teachers, and experts are all consistent. Accordingly, the ALJ erred in assigning little weight to Dr. Sadler's opinion, and in failing to consider the evidence of record, particularly from the school experts, when assessing the severity of T.H.'s speech issues, and when assessing this domain. See 20 C.F.R. §§ 416.924a(1)(iii)(consideration of medical sources), 416.924a(2)(iii)(consideration of information from teachers and school personnel); Rosa, 168 F.3d at 78-79.

"It is not the Court's function to determine de novo whether the claimant was disabled nor to substitute its opinion for that of the Commissioner, but rather to determine whether substantial evidence supports the Commissioner's decision and whether the correct legal standards were applied."  Cardoza v. Astrue, 3:10 CV 1951(MRK)(WIG), 2012 WL 3727160, at *1 (D. Conn. Apr. 13, 2012)(citation omitted).   Substantial evidence of record does not support the ALJ's conclusion that T.H. has a less than marked impairment in the domain of interacting or relating with others, but rather, plaintiff is correct that the evidence of record supports a finding of a "marked" limitation in T.H.'s ability to interact or relate with others, that is, his speech impairment "interferes seriously with [his] ability to independently initiate, sustain, or complete activities." See 20 C.F.R. § 416.926a(e)(2).[11]

### 2. DOMAIN OF CARING FOR ONESELF

The domains of "Caring for Yourself" and "Interacting and Relating with Others" are

---

[11]A finding of a marked limitation in the domain of interacting and relating with others therefore results in a finding of disability, in light of the ALJ having found a marked limitation in the domain of attending and completing tasks.  However, in the interest of completeness, the Court will address the remaining arguments.

"related, but different from each other[,]" in that the domain of "'Caring for [Y]ourself' involves a child's feelings and behavior in relation to self[,]" whereas the domain of "'Interacting and [R]elating with [O]thers' involves a child's feelings and behavior in relation to other people."  Social Security Ruling ["SSR"] 09-7p, at *4, 2009 WL 396029 (S.S.A. Feb. 17, 2009).  See also SSR 09-5P, at *4, 2009 WL 396026, (S.S.A. Feb. 18, 2009).  "Caring for Yourself" is defined in the Regulations, 20 C.F.R. § 416.926a(k), and by SSR 09-7p, as how well a child maintains a healthy emotional and physical state.  This includes how well the child has his physical and emotional wants and needs met in appropriate ways; how the child copes with stress and changes in the environment, and whether the child can take care of his own health, possessions, and living area.  20 C.F.R. § 416.926a(k); SSR 09-7p, at *2. A child's ability to care for himself is determined by the ability to regulate himself and depends upon his ability to respond to changes in his emotions and the daily demands of the environment to help himself, and cooperate with others in taking care of personal needs, health and safety. 20 C.F.R. § 416.926a(k)(1).

Defendant contends that there is no indication in the record that T.H. "'[d]oes not feed, dress, bathe or toilet [him]self appropriately for [his] age,' or '[fails to] spontaneously pursue enjoyable activities or interests[.]'"  (Dkt. #18, Brief at 11, citing SSR 09-7p). However, as stated in SSR 09-7p, "the domain of "Caring for yourself"" "does not address [a child's] physical abilities to perform self-care tasks like bathing, getting dressed, or cleaning up [his] room[,]" but rather, addresses a child's ability to recognize and respond appropriately to his feelings, to cope with negative feelings and express positive feelings appropriately, to express an increased capacity to self-regulate, and, for this child's age group, to develop an understanding of what is right and wrong, and what is acceptable and

unacceptable behavior, and to "demonstrate consistent control" over his behavior while "avoid[ing] behaviors that are unsafe or otherwise not good for you."  20 C.F.R. § 416.926(k)(1)(i)-(iii) & (2)(iv); SSR 09-7p, at *2-6.

In his decision, the ALJ concluded that T.H. has a "less than marked limitation in the ability to care for himself."  (Tr. 26)(emphasis omitted).  Specifically, the ALJ concluded that the "record indicates [T.H.] has some degree of difficulty dealing with stress, such as his fighting with the children with whom he lives, which [his] mother . . . attributed to the stress of living with so many people when previously he just lived with her."  (Id.).  Defendant dismisses the bulk of entries in the school record that evidence T.H.'s problems in this domain, as such entries predate his onset date of January 2010.  (Dkt. #18, Brief at 10; see, e.g., Tr. 106-07 (2008-09 report card: "behavior impedes . . . interacting[,]" "disrupt[ive]" "very unfocused[,]" "difficult to concentrate[,]" having "meltdowns" and "tantrums"); 126 (May 2009: areas of concern are behavior, impulsivity, emotionality, and physical aggression); 325 (June 2009: extreme physical activity, constant motion and brief attention)).  However, post-onset date records, which include records from March 2010 forward when Dr. Sadler began medication treatment, also evidence serious problems handling frustration appropriately.

In the second marking period of the 2009-2010 school year, his teacher noted T.H. is "often out of his seat wanting attention and disturbs the students around him[,]" and he "still shows little self-control[.]"  (Tr. 185).  Additionally, in May 2010, his teacher and principal noted that T.H. will "grunt at the teacher if he doesn't like a direction or correction. He will also badger to get what he wants."  (Tr. 251).  Dr. Sadler and Melillo made similar findings in February 2010:

> Depressive symptoms are significant for . . . negative self-feelings or thoughts ( . . . "I hate me," "I don't like my brain, it doesn't work right"), sad or depressed mood ("when he doesn't get his way"), crying and irritability.
>
> Anxiety is significant for persistent worry (about mom), shortness of breath (when upset), inability to complete tasks, restlessness and poor concentration.
>
> . . .
>
> Oppositional Defiant Disorder is significant for temper tantrums (home and school), blames others for own mistakes, defies or refuses to comply with rules/requests (sometimes at home and school), deliberately annoys others, [and] argues with adults.
>
> . . .
>
>  . . . [T.H.] did however, say he sometimes "punched" himself at school when he became frustrated. . . . He said he felt sad and mad at times but could not verbalize what triggered these feelings. . . .

(Tr. 422-23).  In March 2011, school testing revealed that T.H. engages in distracting sounds, facial grimaces, poor eye contact, constant looking around, stomping of his foot during a stuttering event, and constant movement of his body position.  (Tr. 377-78).  In May 2011, he showed "more defian[ce] and irritab[ility][,]" and he complained of anxiety, and was "'growl[ing]' as a sign, his mother believes, of frustration[.]" (Tr. 411).  The next month, Dr. Sadler noted that T.H. was "highly impulsive and has disrupted the class and threatened to hurt other children with his impulsive exuberance[.]" (Tr. 413).

Defendant contends that Dr. Sadler's January 2012 treatment note shows that T.H. "significantly improved once he began medical treatment."  (Dkt. #18, Brief at 10-11).  In the January 2012 treatment note, T.H. "report[ed] that he has been feeling pretty good under very, very stressful circumstances.  His mother reports that [he] has been doing splendidly under the difficult circumstances. In fact, she has never seen [him] function better under similarly difficult circumstances."  (Tr. 444).  Additionally, earlier treatment notes

reflect that T.H.'s teachers "dramatically notice if a [medication] dose is missed in the morning, but if regularly administered, [T.H.] seems to be doing quite well in school." (Tr. 401-02). T.H. was "doing splendidly" on his medication, as of December 2010 (Tr. 403-04), and in January 2011, he was doing "quite well[]" at school. (Tr. 405). In July 2011, plaintiff reported that T.H. seemed "less sad . . . , not as quiet and not as scattered[,]" and in September, T.H. and plaintiff reported that "things [were] going quite well." (Tr. 417-19). These entries do reflect great improvement for T.H. The ALJ's conclusion that T.H. has a less than marked impairment in this domain acknowledges that he has a moderate impairment in this domain. In this case, there is "substantial evidence to support the Commissioner's decision," so that his "decision must be upheld even if substantial evidence supporting plaintiff's position also exists." Cardozo, 2012 WL 3727160, at *1, citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990).

### 3. DOMAIN OF ACQUIRING AND USING INFORMATION

The domain of acquiring and using information concerns how well an individual acquires or learns information and how well he uses the information he has learned. See 20 C.F.R. § 416.926a(g). For elementary school children, a child without an impairment should be able to learn to read, write, and do math, and discuss history and science, and to use these skills in academic settings, and in daily living situations, such as reading street signs, telling time, and making change. 20 C.F.R. § 416.926(a)(g)(2)(iv). SSR 09-3p explains that

> [a]lthough we consider formal school evidence (such as grades and aptitude and achievement test scores) in determining the severity of a child's limitations in this domain, we do not rely solely on such measures. We also consider evidence about the child's ability to learn and think from medical and other non-medical sources . . . , and we assess limitations in this ability in all settings, not just in school.

2009 WL 396025, at *3 (S.S.A. Feb. 17, 2009).

35

In this case, the ALJ discussed that according to the school psychologist's testing, T.H.'s overall cognitive functioning fell in the average range, with a full-scale IQ score of 93; his distractibility was minimal in "quiet testing sessions"; and although his 2010-2011 progress report indicated that he needs "strengthening in language arts[,]" there was evidence of improvement and he demonstrated progress in mathematics.  (Tr. 23). Acknowledging that T.H. has some restriction in this domain, the ALJ concluded that T.H. has "less than marked limitation in acquiring and using information." (Id.)(emphasis omitted).

In the 2010-2011 school year, when repeating first grade, T.H. received teacher support to complete tasks, and throughout the year, remained "significantly below grade level." (Tr. 324).  He "show[ed] progress from pre to post assessment, but does not always pass." (Id.).  His 2010-2011 first grade teacher noted that T.H. "needs constant re-teaching and practice to show an understanding of first grade skills." (Id.).  While defendant is correct that T.H. "has shown progress" during the  school year, he remained "significantly below grade level[]" in reading at the end of the year.  (Id.).  His March 2011 evaluation revealed that his reading ability was "[v]ery [p]oor[,]" and "reading and writing tasks are challenging for him." (Tr. 303-04).  The ALJ recited in his decision that T.H.'s "2010 to 2011 grade 1 progress report notes that he demonstrated progress or met expectations in mathematics." (Tr. 23).  However, the report states that in math, T.H. could "add and subtract using a number line independently[ ]" by the end of the year, but he continued to "require additional support to complete tasks[,]" and he "usually needs a mini-lesson before completing tasks or must work alongside a teacher." (Tr. 324).  Notably, he was "still performing below grade level expectations" in math. (Tr. 304).  Thus, while he was making "slow progress toward grade level expectations," he had not met such expectations.  (Tr.

36

303).  The ALJ's assessment is not consistent with the underlying school records, and he overstates the improvement and "demonstrated progress[.]" (Tr. 23).  Accordingly, substantial evidence does not support the ALJ's conclusion that T.H. has a less than marked limitation in acquiring and using information.

## V. CONCLUSION

For the reasons stated above, plaintiff's Motion to Reverse the Decision of the Commissioner, or in the alternative, Motion for Remand for a Rehearing  (Dkt. #13) is granted in part such that the case is remanded for the calculation of benefits. Defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #18) is granted in limited part and denied in large part.

The parties are free to seek the district judge's review of this recommended ruling. See 28 U.S.C. § 636(b)**(written objection to ruling must be filed within fourteen calendar days after service of same)**; FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**.

Dated at New Haven, Connecticut, this 7th day of July, 2014.


 /s/ Joan G. Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge